IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

COREY TURNER                                                                    PLAINTIFF

v.                                              Civil No. 6:18-CV-06068

SHERIFF JASON WATSON (Clark County,                                            DEFENDANTS
Arkansas); JOHN DOE[1] (Chief at the Clark
County Detention Center);
ADMINISTRATOR BARNES DERRICK;
and NURSE CASSIE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action provisionally filed pursuant to 42 U.S.C. § 1983.  Pursuant to

the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief

United States District Judge, referred this case to the undersigned for the purpose of making a

Report and Recommendation.

Currently before the Court is a Motion for Summary Judgment by Plaintiff (ECF No. 42)

and a Motion for Summary Judgment by Defendants.  (ECF No. 62).

## I. BACKGROUND

Plaintiff filed his Complaint on August 6, 2018.  (ECF No. 1).  He alleges that his

constitutional rights were violated while he was incarcerated in the Clark County Detention Center

("CCDC") from May 18th through July 17th of 2018.  Plaintiff first alleges Defendants violated a

prior Court order concerning CCDC's violation of the Americans with Disabilities Act.  (*Id*. at 4-

5).  He alleges they knowingly went against the judge's orders by holding him, a handicapped

individual, in a facility that was inadequate and unsafe for handicapped inmates. (*Id*. at 4, 8).

---

[1] The Initial Scheduling Order in this case originally set the deadline for discovery at January 18, 2019, with the deadline to identify Doe Defendants set at December 19, 2018.  (ECF No. 13 at 2).  The discovery deadline for this case was extended to July 16, 2019.  (ECF No. 55).  The time to identify and serve any Doe Defendant is long past.

Plaintiff alleges he fell in the CCDC shower in 2010. (*Id.* at 3). Plaintiff alleges that Defendants denied him adequate medical attention during his incarceration. Specifically, he alleges Nurse Cassie failed to give him his blood pressure medication for over a month, and this could have resulted in his stroke on July 17, 2018.[2] (*Id.* at 5). He states that he had a stroke on July 17, 2018, but no actions were taken to help him until the next day, when he was hospitalized. His life and body have now been permanently altered by the stroke. (*Id.* at 8). He later alleges Nurse Cassie denied him blood pressure medication, inhalers and psychiatric medication. (*Id.*).

Plaintiff proceeds against Defendants in both their official and personal capacity. (*Id.* at 4). He seeks compensatory and punitive damages. (*Id.* at 7).

Plaintiff filed a Motion for Summary Judgment and Statement of Facts on April 29, 2019. (ECF No's. 42, 43). He then filed additional exhibits to the Motion in April and July of 2019. (ECF No's. 48, 50, 51, 60, 61).

Defendants filed their Motion for Summary Judgment on August 16, 2019. (ECF No. 62). They also filed their Response to Plaintiff's Statement of Facts. (ECF No. 65). Plaintiff filed his Response to their Summary Judgment Motion on September 6, 2019. (ECF No. 67). This Response includes one document labelled as a brief and one labelled as an addendum. (ECF No's. 67-1, 67-2).

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[2] The summary judgment record indicates he suffered his stroke on July 18, 2018.

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing, Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.  ANALYSIS

Defendants argue summary judgment in their favor is appropriate because: 1) Plaintiff failed to exhaust his administrative remedies concerning his blood pressure medication and any ADA violations based on the structure of the facility; 2) there is no proof of any personal involvement by Defendant Watson regarding any of Plaintiff's claims; 3) there was no violation of a prior Court Order; 4) Defendant were not deliberately indifferent to Plaintiff's medical needs; 5) to the extent Plaintiff asserts a claim for medical injury pursuant to the Arkansas Medical Malpractice Act, he failed to offer qualified expert testimony to meet his statutory burden of proof; 6) Defendant are entitled to qualified immunity; and 7) there is no basis for official capacity and county liability. (ECF No. 63 at 3-23).

In his Motion for Summary Judgment, Plaintiff argues it should be granted in his favor because: 1) Liability of Reckless Indifference; 2) Deliberate Indifference; 3) Gross Negligence; 4) Medical Neglect; 5) Inadequate Medical Attention to Serious Medical Need; 6) Administrational Liability; 7) Violation of American Disability Act/Rehabilitation Act; and 8) Violation of the Eighth Amendment. (ECF No. 42 at 1-2).

In his Response to Defendants' Motion for Summary Judgment, Plaintiff clarifies that his Complaint is that Defendants placed him in the same hazardous and unsafe showering environment, that Defendants were deliberately indifferent to his medical needs resulting in a stroke, and medical care was delayed when he suffered his stroke. (ECF No, 67-1 at 1). He argues that he filed grievances and had face-to-face conversations concerning his medications, including his blood pressure medication. (ECF No. 67-1 at 2). He also argues they should have provided him copies of medical release forms. He points to the incident report concerning the day of his stroke, where one jailer told another jailer that they were not permitted to call an ambulance unless it was a life or death emergency situation "per Sheriff." (ECF No. 67-1 at 3). He argues that this order by the Sheriff was put in place even though his jailers are not medically trained to be able to diagnose or recognize medical conditions appropriately. (ECF No. 67-1 at 6). Plaintiff argues the delay in providing him blood pressure medicine constitutes deliberate indifference because Nurse Cassie was his medical provider when he was in CCDC in 2017, knew he needed the medication, and delayed providing it to him. (ECF No. 67-1 at 5). He further alleges Defendant Barnes knew he needed the medication, and all Defendants had been "exposed" to his information. (ECF No. 67-1 at 5). Finally, Plaintiff argues that the medical records from Baptist Health satisfy the requirement of the Arkansas Medical Malpractice Code. (ECF No. 67-1 at 7).

As a preliminary matter, the Court notes that Plaintiff was booked into CCDC on May 20, 2018, and transferred to the Nevada County Jail shortly thereafter.   According to Plaintiff's deposition and records from Nevada County, he was taken to Nevada County on May 29, 2018, and returned to CCDC on June 14, 2018.  (ECF No's. 50 at 4; 64-9 at 61).  The Court also notes that Plaintiff's medical records from Baptist Health indicate he was admitted for a cerebrovascular incident on July 19, 2018.  (ECF No's. 64-4 at 12; 67-2 at 5).

### A.  Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   Exhaustion is mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  *Id.* at 218 (internal quotation marks and citation omitted).  The Court stated the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Id.*

The Eighth Circuit has recognized two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or (2) when the officials themselves fail to comply with the grievance procedures.  *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (citing *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) (explaining a prisoner is only required to exhaust those administrative remedies that are available and any remedies that prison officials prevent a prisoner from utilizing are not considered available)).

5

There is no dispute that CCDC has a grievance procedure in place.  This procedure requires all requests and grievances, including those of a medical nature, to be submitted in writing on the appropriate form.  (ECF No. 64-8).  The grievance form provides a place for an inmate to indicate he wishes to appeal the response to the grievance.  (ECF No. 64-3 at 2).  Plaintiff failed to submit any written grievances or request forms at CCDC concerning his blood pressure medication,[3] medical release forms, or any ADA violations concerning the CCDC facility accommodations.  (ECF No's 64-3; 67-3 at 15-22).  He submitted several grievances and medical requests concerning his psychiatric medication, his pain medication, and scheduled neck surgery he missed due to his incarceration.  (*Id*.)  His only mention of blood pressure in these documents was to indicate that his blood pressure had not been taken, and to note that his headache was due to his neck issues, which needed surgery to correct.  Indeed, he states that "[t]his headache ain't from blood pressure." (ECF No. 64-3 at 3, 7).  The ADA is mentioned only in reference to the alleged inadequacy of the medical care he was receiving.  (ECF No. 64-3 at 4-6).

In his deposition, Plaintiff admitted that he had not filed any written requests or grievances concerning his blood pressure medication or medical release forms.  (ECF No. 64-9 at 30-33, 64-65).  Instead, Plaintiff testified that he spoke to Defendant Barnes on June 14, 2018, was told it would be taken care of, and he was seen by Nurse Cassie.  (ECF No. 64-9 at 64-65).  Even if true, nothing in the CCDC policies permit a verbal request to initiate or exhaust the grievance procedure. *See Jones* 549 U.S. at 218 (it is the prison's requirements which define the proper boundaries of exhaustion).  Plaintiff therefore failed to exhaust his administrative remedies concerning his blood pressure medication, medical release forms, or any ADA violations concerning the CCDC facility

---

[3] Plaintiff did mention a lack of blood pressure and psychiatric medication in a Nevada County Jail grievance on June 8, 2018, but the Nevada County Jail is not a party to this lawsuit.  (ECF No. 50 at 3).

accommodations, and made no allegations which could give rise to a PLRA exhaustion exception for these claims. [4]

Plaintiff did, however, file a CCDC medical request form on July 18, 2018, concerning the delayed response in seeking medical care for his apparent stroke. Plaintiff therefore appears to have exhausted his administrative remedies for this claim.[5]

### B. Delay or Denial of Medical Care-Personal Capacity Claims

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those

---

[4] The summary judgment evidence also indicates Plaintiff started receiving hypertension medication on June 24, 2018. On his medical intake at CCDC, Plaintiff reported that he took Norvasc (amlodipine) for his hypertension. He also reported that he did not use drugs, he "only tests" his methamphetamine and cocaine before he sells it. (ECF No. 64-4 at 1). Plaintiff's prescription records from AllCare Correctional Pharmacy indicate that a prescription for amlodipine for Plaintiff was filled on June 16th and June 22nd of 2018. (ECF No. 64-7 at 5,6; 67-2 at 11-12). The medication log indicates he started receiving amlodipine on June 24, 2018. (ECF No. 64-7 at 2). In his deposition, Plaintiff admitted that he signed the medication logs with his initials, but stated he felt that someone added the amlodipine notations after he signed. (ECF No. 64-9 at 43-46). The logs and the placement of the notations on the logs contradict Plaintiff's allegation that he never received amlodipine. (ECF No. 64-7 at 2-4). The logs themselves were certified as true and accurate by the current CCDC Jail Administrator. (ECF No. 64-1). In his deposition, Plaintiff testified that he thought he filled all of his prescriptions in 2018 (prior to incarceration) at the AllCare pharmacy in Gurdon. He did not remember the last time he had filled his amlodipine prior to his arrest. (ECF No. 64-9 at 95). Plaintiff provided his AllCare pharmacy records, which indicated that he filled a prescription for 30 amlodipine on February 13, 2018. (ECF No. 67-2 at 14). He could not remember where he filled the prescription after that point. (ECF No. 64-9 at 96-97).

[5] The CCDC policy addresses medical requests, requests, and grievances under the same heading. There is no statement in the policy informing inmates that only grievances may be used to exhaust administrative remedies. The Court will therefore treat the medical request form as a grievance for PLRA purposes.

needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id*.

It is well settled that "[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* (internal citations omitted). Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05. However, the "Constitution does not require jailers to handle every

medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'" *Holden v. Hirner,* 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub,* 638 F.3d at 919 (citing *Roberson v. Bradshaw,* 198 F.3d 645, 648 (8th Cir. 1999)); *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

There is no dispute that Plaintiff's stroke constitutes an objectively serious medical need. The question is whether any of the Defendants for this case actually knew of but deliberately disregarded those needs. Plaintiff's grievance concerning the delay states that around 6:00 pm on July 18, 2018, he told Officer Andrew that he had urinated on himself "without [his] knowledge" so he took a shower. (ECF No. 64-3 at 14). Andrew then went to Officer Jackson who told him that if Andrew had not witnessed the event, then nothing could be done. Around 7:30 pm. Officer Andrew came to check on Plaintiff and tried to give him an exam. Plaintiff notes that Andrew is not a nurse or a doctor, but asked Plaintiff to try to raise his arm and open his mouth. Andrew told him it looked as though he had suffered an allergic reaction or stroke-like symptoms. (ECF No. 64-3 at 14-15). Plaintiff asked for an extra blanket because he was cold and started to feel numb. (ECF No. 64-4 at 15). Around 10:45 pm pill call "Andrew was asked to call for an ambulance." (*Id.*). It is not clear if Plaintiff asked or if someone else asked for the ambulance. Andrew stated he was going to call Nurse Cassie instead. Plaintiff states that at this time he could not move and

his right side had gone numb.  (*Id*.).  Plaintiff's grievance ends with the statement that it was now

11:00 pm and still no word or ER visit.  (*Id*.).

Officer Jackson filed an incident report concerning Plaintiff's stroke.  (ECF No. 64-5).  In

it he states:

> At. approximately 1900 hours on July 18, 2018 Jailer Andrew Ridgell called me on my personal cellphone about Inmate Corey Turner. Jailer Andrew Ridgell stated that Inmate Corey Turner was acting weird, and his face was droopy from like a seizure from earlier in·the day. I Jailer Caleb Jackson then stated to Jailer Andrew Ridgell we can't call an ambulance unless it is a life or death emergency situation per Sheriff.  I Jailer Caleb Jackson stated to Jailer Andrew Ridgell to just watch Inmate Corey Turner, and to give him a medical request form because that is all we can do at the moment.  At. approximately 1800 hours on July 19, 2018, I Jailer Caleb Jackson was told by Jailer Joe Love he had been at the hospital all day with Inmate Corey Turner.  Inmate Corey Turner turned in a medical form on July 18, 2018 stating that Inmate Corey Turner had urinated on himself without his knowing so he took a shower. Inmate Corey Turner then told Jailer Andrew Ridgell about the situation and Jailer Caleb Jackson said if he didn't witness it there is nothing that could be done. Jailer Andrew Ridgell went to checked on Inmate Corey Turner, Jailer Andrew Ridgell then proceeded to give Inmate Corey Turner a field observation by asking him to lift his arms, and open his mouth. Jailer Andrew Ridgell told Inmate Corey Timer he thought he had an allergic reaction, or stroke like symptoms.  Inmate Corey Turner asked Jailer Andrew Ridgell for an extra blanket because at this point his body was becoming cold, and numb.  Jailer Andrew Ridgell was then asked for an ambulance, Jailer Andrew Ridgell told Inmate Corey Turner he was going to call Nurse Cassie instead. Inmate Corey Turner says in his medical form by this point the whole right side of his body is numb, and still has not received medical attention. On July 19, 2018 I Jailer Caleb Jackson read Inmate Corey Turners medical request form, and was concerned because I Jailer Caleb Jackson was not notified by Jailer Andrew Ridgell of any of the symptoms, or Incidents from Inmate Corey Turner's medical request form. I Jailer Caleb Jackson asked Jailer Andrew Ridgell about Inmate Corey Turner's medical request form if there was any truth to this matter. Jailer Andrew Ridgell stated to I Jailer Caleb Jackson that Inmate Corey Turner was acting weird, and that his face was puffy on the right side that is when Jailer Andrew Ridgell had called I Jailer Caleb Jackson on my personal cell phone. Jailer Andrew Ridgell stated to I Jailer Caleb Jackson that he had not been notified that Inmate Corey Turner had urinated upon himself until after the phone call to I Jailer Caleb Jackson. Jailer Andrew Ridgell Stated to Jailer Caleb Jackson that he had asked Inmate Corey Turner to raise his arms, and open his mouth. Jailer Andrew Ridgell believed it to be an allergic reaction so Jailer Andrew Ridgell gave Inmate Corey Turner two Benadryl. When Inmate Corey Turner asked Jailer Andrew Ridgell for extra blankets Jailer Ridgell told trustee's to give him extra blankets. Jailer Andrew Ridgell stated to I Jailer Caleb Jackson

that Inmate Corey Turner never asked for an ambulance or to go to the emergency room, but that Inmate Wesley Bufford had told Jailer Andrew Ridgell to call the ambulance for Inmate Corey Turner. Jailer Andrew Ridgell stated to I Jailer Caleb Jackson that he had told Inmate Corey Turner that he was going to leave a note for the day shift jailer's to call Nurse Cassie Gonzalez. I Jailer Caleb Jackson did not call for medical attention for Inmate Corey Turner on July 18, 2018.Because I Jailer Caleb Jackson was not notified, nor witness to any of Inmate Corey Turners symptoms, or incidents from lack of communication by Jailer Andrew Ridgell.

(ECF No. 64-5 at 1).

Plaintiff filed an affidavit from his mother. (ECF No. 61). She stated she received a call from Plaintiff on July 19, 2018 at around 12:25. She states Plaintiff was trying to tell her that he had a stroke the previous night, but she could not understand him because his speech was "blurry." Someone in the background told her she needed to come to the jail because Plaintiff had a stroke and no one cared. She asked Corey to give the phone to that person, who was Wesley Buford, and he told her that Plaintiff needed medical attention, and no one seemed to care. She called the Jail around 12:35 and spoke with a jailer to tell him that Plaintiff needed medical help ASAP. She then called Plaintiff's wife and told her to call as well. Plaintiff's mother called back at about 12:45 pm and the jailer told her they were sending Plaintiff to the hospital. The jailers on duty on July 19th were Jackson and Andrew. She was not sure what jailers were on duty on July 18th. The Arkadelphia hospital treated Plaintiff and sent him to a Little Rock hospital for care. (*Id*.).

Based on the summary judgment evidence presented, it appears there is a fact question as whether Jailer Andrew knew of but deliberately ignored an acute or escalating situation regarding Plaintiff's stroke. Further, Jailer Jackson's role is less clear, but the summary judgment evidence here permits the inference that he was in some way involved in the incident. Plaintiff has provided medical records to show he suffered permanent detrimental effects from the stroke for purposes of summary judgment. (ECF No. 48). This permits the inference that the delay in getting him medical care for his stroke caused or contributed to those detrimental effects. His claims for denial

and delay of medical care for his stroke therefore meet the second prong of the deliberate indifference test.  Neither Jailer Andrew nor Jailer Jackson are defendants in this case.

There is no evidence in the summary judgment record, however, that any of the named Defendants in this case were aware of or personally involved in Plaintiff's health care emergency on July 18th or July 19th of 2018.  "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights."  *Clemmons v. Armontrout,* 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006)); s*ee also Kulow v. Nix,* 28 F.3d 855, 859 (8th Cir. 1994) ("if any claim of medical indifference . . . is to succeed, it must be brought against the individual directly responsible for [Plaintiff's] medical care.").  It is therefore recommended that Plaintiff's personal capacity claims, for denial or delay of medical treatment, against Defendants should fail as a matter of law.

### C.  Delay or Denial of Medical Care-Official Capacity Claims

Under Section 1983, a defendant may be sued in either his personal capacity, or in his official capacity, or in both.  In *Gorman v. Bartch,* 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit Court of Appeals discussed the distinction between individual and official capacity suits.  As explained by the Court in *Gorman*:

> "Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available.  *See Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).  Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself.  *Id.* 502 U.S. at 24-27, 112 S.Ct. at 361-62 (1991).  Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense.  *Id.* 502 U.S. at 25-27, 112 S.Ct. at 362."

*Gorman,* 152 F.3d at 914.

A custom conflicting with a written policy can support an official capacity claim. *Johnson v. Douglas County Med. Dept.*, 725 F.3d 825, 829 (8th Cir. 2013) However, to establish the existence of such a custom, Plaintiff must demonstrate:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Id.* at 828.    Under this standard, "multiple incidents involving a single plaintiff could establish a custom if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." *Id.*

Here, Defendants have provided a copy of the CCDC medical emergency policy.   (ECF No. 64-8).  It states if a detainee needs immediate or emergency medical treatment, the Jailer shall notify the Jail Administrator and gain authorization for transport to the hospital.   Once authorization is gained, the jailer should contact dispatch for a Deputy or Ambulance and fill out a medical treatment form to send to the hospital.  They should then fill out a Jail Incident Report stating the reasons for the emergency transport, place a copy of the report in the Detainee's file, and log it in the Jail Log.  The policy, on its face, does not violate any constitutional rights.  Indeed, based on the incident report and other summary judgment evidence it appears there is question whether jailers failed to follow this policy.

13

Plaintiff argues that the language in the incident report stating that jailers are not to call an ambulance unless it is a life or death emergency situation "per Sheriff" is sufficient to indicate that CCDC had a custom which conflicted with the written policy. The Court agrees that the language in the incident report is troubling. But a single incident, however unfortunate, is insufficient to support the existence of a custom in conflict with the written policy. Plaintiff has therefore failed to allege any summary judgment facts to support his claim that a custom or policy of Clark County violated his constitutional rights.

Because Plaintiff failed to provide any summary judgment facts to support his claim that a custom or policy of Clark County violated his constitutional rights his official capacity claims it is recommended that his official capacity claims should be dismissed as a matter of law.

### D. Violation of a Court Order

Plaintiff clarified in his Response that his claim concerning the ADA violations was that Defendants placed him in the same "unsafe showering environment" as was present in his past case. Plaintiff's prior successful case is *Turner v. Turner*, Case No. 6:10-cv-06064 (W.D. Ark. 2012). In that case, Plaintiff fell several times in the shower of CCDC, resulting in several trips to the emergency room, and the exposure of orthopedic hardware in his hip. After a bench trial, the undersigned issued a memorandum opinion finding that CCDC was not adequately equipped to hold mobility impaired inmates.[6] Specifically, the Court noted that both the Sheriff and the Jail Administrator were aware of Plaintiff's falls, and their unwritten policy of making a wheelchair and a chair with metal legs available in the shower were clearly inadequate in light of Plaintiff's repeated falls. The Court further noted that Defendant could have accommodated Plaintiff with

---

[6] Testimony at the trial indicated that CCDC usually placed handicapped inmates on an ankle monitor or housed them in a different facility. However, Plaintiff had already been released and had his release revoked, and the judge ordered that he be detained as a flight risk. (Case No. 6:10-cv-06064, ECF No. 66 at 7-8).

the simple purchase of a shower chair, a nonskid mat, or grab bars. (Case No. 6:10-cv-06064, ECF No. 66 at 9-10). Plaintiff was awarded one-thousand dollars in compensatory damages for each of his three falls and Defendant were directed to pay his court filing fee. (*Id*. at 12). A satisfaction of Judgment in the case was entered on December 10, 2012, and the case was closed. (Case No. 6:10-cv-06064, ECF No.68).

In his deposition, Plaintiff testified that he believed the prior case required the jail to make changes in the facility. (ECF No. 64-9 at 67). There is, however, nothing in the Court's opinion from the prior case which does so. Plaintiff further testified that he did not fall in the shower in 2018. He testified he was not asserting a claim that he was injured by a lack of handicap accessibility. (ECF No. 64-9 at 68). Further, as discussed above, Plaintiff filed no grievances concerning any ADA violations concerning the CCDC facility accommodations.

As there is no summary judgment evidence of non-compliance with this Court's prior Order in the summary judgment record, it is recommended that Plaintiff's claim concerning the prior Court order should be dismissed as a matter of law.

## IV.  CONCLUSION

Accordingly, I recommend that Defendants Summary Judgment Motion (ECF No. 62) be **GRANTED** and Plaintiff's Motion for Summary Judgment (ECF No. 42) be **DENIED**. Plaintiff's Complaint should be **DISMISSED WITH PREJUDICE**.

The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 30th day of January 2020.

/s/ *Barry A. Bryant*
_____

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE